UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY POTNICK, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 8753 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| VILLAGE OF GLENVIEW, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Jeffrey Potnick alleges that his former employer, the Village of Glenview, terminated him in violation of the Age Discrimination in Employment Act ("ADEA"), 20 U.S.C. § 621 *et seq.*, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Doc. 10. The Village moves for summary judgment. Doc. 25. The motion is granted.

**Background**

As a preliminary matter, Potnick's opposition brief asserts facts not presented in either his Local Rule 56.1(b)(3)(B) response to the Village's Local Rule 56.1(a)(3) statement or his Local Rule 56.1(b)(3)(C) statement. Doc. 43 at 6, 10-12. Those facts are disregarded because facts may be considered on summary judgment only if presented in a compliant Local Rule 56.1 statement or response. *See Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court"); *Perez v. Town of Cicero*, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (internal quotation marks omitted). The court also disregards the portions of Potnick's Local Rule

1

56.1(b)(3)(B) response that simply assert, without record support, that he "objects to [the Village's] statement … [because it] is argumentative and self-serving, and has no probative value whatsoever," or some variation thereof. Doc. 44 at ¶¶ 9, 11, 27-38, 40, 44-52, 59-74, 76-80; *see Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (holding that "where a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial"); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial.").

Another preliminary matter arises from Potnick's hearsay objections to several assertions in the Village's Local Rule 56.1(a)(3) statement. "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). The bulk of Potnick's hearsay objections pertain to negative comments regarding his performance that his supervisor, Brent Reynolds, received from others, or similar negative comments that Reynolds himself made. Doc. 44 at ¶¶ 30-36, 38, 40, 44-45, 50-52, 61, 68, 74. The objections are overruled. While those out-of-court statements are not admissible for the truth of the matter asserted—*i.e.*, that Potnick in fact failed to perform his duties adequately—they may be considered when evaluating the effect they had on Reynolds as his supervisor and the principal decisionmaker regarding his employment. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from the plaintiff's former employer was not hearsay because it had been "considered not for its truth, but to show its effect on the state of

mind" of the defendant hospital in rejecting the plaintiff's application); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay."); *Corral v. Chi. Faucet Co.*, 2000 WL 628981, at *5 & n.4 (N.D. Ill. Mar. 9, 2000) (holding that a co-worker's statement that the plaintiff made a threat was "admissible on summary judgment not for the truth of the matter asserted, but to show [the decisionmaker's] state of mind and reason for recommending [the plaintiff's] termination").

Potnick's other hearsay objections pertain to his own out-of-court statements. Doc. 44 at ¶¶ 47, 51, 62. Because Potnick is the party opponent of the party (the Village) introducing those statements, they are non-hearsay. *See* Fed. R. Evid. Rule 801(d)(2)(A) (providing that a statement that is offered against an opposing party and that "was made by the party in an individual or representative capacity" is not hearsay); *Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (holding that because a "statement is not hearsay when offered against an opposing party and … made by the party's agent or employee on a matter within the scope of that relationship," a non-party employee of the defendant employer could testify regarding what her supervisor had said about the employer's decision not to hire the plaintiff); *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 825 n.4 (7th Cir. 1999) ("[S]tatements made by … [the] defendants … are not hearsay because they are made by party opponents.").

With these preliminaries resolved, the following facts are set forth as favorably to Potnick as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

Reynolds, the Village's Director of Police and Fire Dispatch, hired Potnick to serve as a full-time telecommunicator in its Public Safety Support Services Division, referred to

3

colloquially as the "dispatch center," which provides emergency and nonemergency dispatch services to several municipalities. Doc. 44 at ¶¶ 4, 6, 13, 19. Potnick began a twelve-month probationary period on December 4, 2014. *Id*. at ¶¶ 4, 9-10. The Village treats probationary and non-probationary employees "very differently." *Id*. at ¶ 11. Non-probationary employees may be fired only for "just cause," while probationary employees are not protected by the "just cause" standard. *Id*. at ¶¶ 8-9. Moreover, the Village "typically only gives counselings, verbal warnings, and written warnings to probationary employees," and will, rather than suspend a probationary employee, "often skip straight to termination" after "more egregious errors or after multiple written warnings." *Id*. at ¶ 11.

Over Potnick's eleven months as a full-time probationary employee, several Daily Observation Reports prepared by his supervisors gave him marks of "4" or "5" on a scale of 5 on various assessment metrics. Doc. 48 at ¶ 31. Still, Reynolds was "periodically informed" that Potnick was performing poorly and making "dispatch errors … [and] address verification errors." Doc. 44 at ¶ 30. Two supervisors told Reynolds in December 2014 that Potnick was "unable to work by himself as a call-taker." *Id*. at ¶ 31. Reynolds received emails in January and February 2015 expressing concerns with Potnick's skills and noting that he struggled to correctly input addresses. *Id*. at ¶¶ 32, 34. One trainer told Reynolds in February that he had "deep concerns over [Potnick's] successful completion of his training program" and that "it would seem he is getting worse, not better." *Id*. at ¶ 35.

In March, Reynolds was told that Potnick had made two dispatch errors, and reminded him to be careful when speaking on an "open mic" because he had been recorded expressing frustration after a call. *Id*. at ¶¶ 36-38. In April, Reynolds received a memorandum from Potnick summarizing a dispatch error he had made. *Id*. at ¶ 39; Doc. 48 at ¶ 24. (Potnick asserts

4

that a computer error was responsible, Doc. 48 at ¶ 24, but his memorandum admitted that he "immediately informed [another employee] of [his] error" and that the other employee "corrected his error," Doc. 27-5 at 24.) In June, Reynolds was copied on an email stating that Potnick "need[ed] some work," and he received another email stating that Potnick had taken responsibility for a delayed emergency dispatch call. Doc. 44 at ¶¶ 40-41. (Potnick asserts that the latter email indicates that "any error [he had] made was the result of the failure of others to properly train him," but the email actually states that Potnick "took full responsibility for [sic] delay in alarm call." Doc. 27-5 at 6.)

In July, Potnick emailed Reynolds regarding an address error that he had made. Doc. 44 at ¶ 42. (Potnick asserts that this "does not accurately state the information" in the documents cited by the Village, but the Village's reading of those documents is confirmed by Potnick's deposition testimony that he "reported an address error" to Reynolds in July. Doc. 45-3 at 26.) Shortly thereafter, Reynolds told another employee via email that they "need[ed] to look at ending [Potnick's] training program and ending his employment if he isn't finished with [all training modules] by September 1st, but if he makes another mistake with sending units to the wrong address again he should be terminated immediately." Doc. 44 at ¶ 43.

In August, Reynolds was notified of several "additional incidents involving Potnick," including an "unprofessional conversation with a fellow coworker" in which he used profanity. *Id*. at ¶ 44. (Potnick asserts without contradiction that "everybody swore" in the dispatch center. Doc. 48 at ¶ 25.) Reynolds was also informed that Potnick had failed to "timely dispatch a call" and that a trainer "could not recommend that Potnick be fully released to work on his own for dispatching police calls." Doc 44 at ¶ 44.

5

On August 30, Potnick had a "verbal altercation with a Highland Park police officer." *Id*. at ¶ 45. The incident arose when the officer "stormed into the dispatch center, yelling and screaming," to confront Potnick regarding a call that he had handled earlier that day. Doc. 48 at ¶ 27; *see also* Doc. 44 at ¶ 45. Potnick told the officer: "You called yourself out, asshole. Listen to the fucking radio next time. You would have figured out what was going out." Doc. 44 at ¶ 47. (Potnick disputes this, but this quotation is drawn from his own deposition testimony. Doc. 45-3 at 39.) Reynolds considered terminating Potnick for this conduct, but he instead opted for a "verbal counseling," which occurred on October 1. Doc. 44 at ¶ 49.

In September, Village personnel wrote several counseling memoranda addressed to Potnick stemming from certain of his actions in August. One dealt with his "failure to help a male caller locate an intoxicated woman." *Id*. at ¶ 51. Another highlighted his failure to dispatch a police officer in response to a call and to code the call correctly. *Id*. at ¶ 52.

In October, Potnick received a performance evaluation with an overall rating of 1.90, just shy of 2.0, or "Meets Expectations." Doc. 48 at ¶ 17. The areas in which Potnick received a score of 1, or "Does Not Meet Expectations," were "Usage of Sick Time," "Problem Solving/Decision Making," and "Jurisdictional Geography." *Id*. at ¶ 18.

Potnick was not made aware during his tenure of many of the above-referenced incidents or concerns. Specifically, Potnick asserts that after he informed "management" in mid-October of his need for surgery and desire to take FMLA leave—of which more in a moment—he was "told of problems with his work, none of which matters had ever been discussed with him before." *Id*. at ¶ 14. In support, Potnick cites his own affidavit, which avers that he was never informed of certain communications among his supervisors regarding his performance or of certain incidents that had alarmed Reynolds and other Village employees. Doc. 44-2 at ¶¶ 4-6, 8,

6

12, 14.  Potnick's affidavit, however, does not dispute that he received a verbal counseling from Reynolds regarding his August 30 altercation with the Highland Park police officer.  The affidavit avers: "I never informed of the alleged incidents in August, 2015.  At no time did I ever swear directly toward any co-worker."  *Id*. at ¶ 14.  Context makes clear that this averment refers not to the August 30 incident, but rather to three written counseling memoranda prepared by Village personnel in September to address an allegedly unprofessional conversation with a coworker and his handling of two other calls in August.  *Ibid*.; *see* Doc. 44 at ¶¶ 44, 50-52.  Potnick could not possibly have been unaware of the August 30 "incident"; indeed his affidavit specifically addresses it, stating that the "confrontation … was wholly the result of inappropriate conduct by the … officer."  Doc. 44-2 at ¶ 16.  And Potnick failed to properly deny the Village's assertion that Reynolds gave him a verbal counseling regarding that incident.  Doc. 44 at ¶ 49.

At some point in mid-October, Reynolds informed Potnick of a complaint from the Village of Deerfield about his performance and advised him that he "sounded too 'Chicagoesque.'"  Doc. 48 at ¶ 15.  That was the first time Potnick had been criticized for sounding too "Chicagoesque."  *Id*. at ¶ 16; Doc. 45-3 at 16.

Also in mid-October, Potnick spoke with the Village's Human Resources Director, Sarah Schillerstrom, to discuss the possibility of his taking FMLA leave to have hip surgery in early 2016.  Doc. 44 at ¶¶ 16, 57; Doc. 48 at ¶ 10.  Schillerstrom told Potnick to contact her when he had more information about timing, adding that she then would provide him with the appropriate FMLA notice and physician's certification form.  Doc. 44 at ¶ 58.  She also mentioned that Potnick should inform his dispatch supervisors about his plan to take FMLA leave so that they could adjust staffing levels to accommodate his absence.  *Ibid*.; Doc. 48 at ¶ 11.

7

Potnick also told a telecommunicator supervisor, Anna Marchiafava, that he needed hip surgery and would need time off for the procedure. *Id*. at ¶ 53; Doc. 48 at ¶ 8-9. Marchiafava told Potnick that he should think about taking FMLA leave. Doc. 44 at ¶ 54. She did not tell Reynolds or Eric Deloy, Reynold's Deputy Director, that Potnick might need to take FMLA leave or have surgery. *Id*. at ¶ 55. (Potnick protests that this is "not true." *Ibid*. However, the Marchiafava deposition transcript supports the assertion, Doc. 27-8 at 23, and Potnick cites no evidence to the contrary.) But Marchiafava did question several other members of the dispatch center about Potnick's plans. Doc. 48 at ¶ 13; Doc. 45-3 at 14.

On November 3, Potnick entered an incorrect address into the dispatch center's system after receiving a call from an injured woman, resulting in a two minute delay in sending an ambulance to the correct address. Doc. 48 at ¶ 19. Potnick told his supervisor, John Yaou, about the mistake. *Id*. at ¶ 20. Deloy informed Reynolds of the incident and also relayed his suspicion that Potnick had attempted to persuade Lake Forest Battalion Chief Gallo to cover it up. Doc. 44 at ¶ 65. After listening to the recorded call between Gallo and Potnick, Reynolds agreed that Potnick's language suggested that he was attempting to persuade Gallo to refrain from reporting his error to Village management. *Id*. at ¶ 67.

On November 10, Deloy and Schillerstrom held a pre-termination meeting with Potnick. *Id*. at ¶ 70; Doc. 48 at ¶ 21. Deloy accused Potnick of trying to conceal his failure to input the correct address on November 3. Doc. 48 at ¶ 20. Potnick denied the charge, noting that he had informed Yaou of the accident and had called Gallo on "a line which he knew was recording the telephone conversation." *Id*. at ¶ 21. At the meeting's conclusion, Potnick was told that the Village was considering terminating him. *Id*. at ¶ 22.

8

Reynolds then decided to fire Potnick. Doc. 44 at ¶ 71. His decision was based on the totality of Potnick's poor performance, a belief that he was incapable of improving, and a concern that he had attempted to persuade Gallo to cover up his dispatch error. *Id*. at ¶¶ 71-73.

On November 16, Potnick was fired; he was 62 years old at the time. *Id*. at ¶ 80; Doc. 48 at ¶ 3. Potnick asserts that the letter stating the grounds for his firing misrepresented the cited incidents. *Id*. at ¶¶ 23-29. And he further asserts that he personally witnessed younger employees "make the same errors in entering wrong addresses, and the like," without being disciplined. *Id*. at ¶ 30.

## Discussion

### I. FMLA Claim

Potnick's FMLA claim alleges that the Village fired him because he planned to take FMLA leave. Doc. 10 at ¶¶ 14-15. The FMLA "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (citing 29 U.S.C. § 2615(a)(2), (b)); *see also Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012). The court assesses "a claim of FMLA retaliation in the same manner that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *see also Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The causation element "requires proof that the desire to retaliate

was the but-for cause of the challenged employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (internal quotation marks omitted).

The Village argues that no reasonable jury could find that Potnick's request for FMLA leave was the but-for cause of his termination. In so doing, it contends that Potnick cannot prevail under either of "two different methods for proving discrimination based on exercising rights under the FMLA: (1) the direct method; and (2) indirect method." Doc. 36 at 13. This misstates the governing analysis. Until recently, employment discrimination plaintiffs opposing summary judgment could deploy either the direct or indirect methods of proof. *See, e.g., Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), however, the Seventh Circuit disapproved the direct-and-indirect-method framework, and it has since held that, when assessing an FMLA retaliation clam, the court should simply inquire whether "the record contains sufficient evidence to permit a reasonable factfinder to conclude that [a defendant] fired [an employee] in retaliation for taking FMLA leave." *Mourning v. Termes Packaging, Ind., Inc.*, 868 F.3d 568, 571-72 (7th Cir. 2017); *see also Lord*, 839 F.3d at 563 (holding that a court must ask whether "the record contain[s] sufficient evidence to permit a reasonable fact finder to conclude that [a defendant's] retaliatory motive caused [a plaintiff's] discharge").

Potnick argues that a reasonable jury could find that he was terminated because of his plans, related to Marchiafava and Schillerstrom, to take FMLA leave for his hip surgery. In support, Potnick notes that shortly after he mentioned his hip surgery to Marchiafava, she spoke with other Village employees about whether they knew of his plan to take leave. Doc. 43 at 6-7. Potnick also observes that his pre-October 2015 performance evaluations suggested he was "meeting expectations," but that once his supervisors learned of his plans to have hip surgery,

"everything changed" and he began to receive reprimands. *Ibid*. And Potnick adds that when he was fired weeks after revealing that he would likely take FMLA leave, his termination letter accused him of misconduct of which he had not previously been informed. *Id*. at 7.

The record does not allow Potnick to meet the FMLA's but-for causation requirement on summary judgment. Potnick has not shown that any Village employee was unsupportive of his taking FMLA leave. *See Mourning*, 868 F.3d at 572 (affirming summary judgment on an FMLA retaliation claim where the plaintiff had failed to "identify anyone in the office who she believed had an issue with her taking leave"). And the record refutes the notion that the Village's treatment of him changed after he discussed his upcoming surgery with Marchiafava and Schillerstrom. It is true that Reynolds informed Potnick that his speech was too "Chicagoesque" during that time frame, but Potnick had previously received at least one verbal counseling, and his pre-October performance otherwise was severely deficient.

In this regard, Potnick fails to identify "any evidence reasonably suggesting that [the Village] fired him for a reason other than his performance." *Pullins v. Amazon.com.Indc, LLC*, 671 F. App'x 383, 385 (7th Cir. 2016). Almost from the beginning of Potnick's tenure as a probationary employee, Village personnel reported to Reynolds that he would be unable to successfully complete his training program, that his conduct was at times inappropriate, and that he had made numerous errors when taking calls and dispatching ambulances. Indeed, as early as July 2015, Reynolds broached the subject of firing Potnick, noting in an email to a colleague that if he made "another mistake with sending units to the wrong address again he should be terminated immediately." Doc. 44 at ¶ 43. None of the evidence adduced by Potnick—a performance evaluation in which he fell short of receiving a score of "Meets Expectations," and Daily Observation Reports indicating that he at times received a score of "4" or "5" for certain

skills—calls into question the fact that Reynolds and others had become gravely dissatisfied with his performance long before he disclosed the possibility of taking FMLA leave. Given the nature of his work as an emergency dispatch operator, and in light of his repeated and significant errors, Potnick was, quite literally, a disaster waiting to happen. *See Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016) ("Perhaps most damningly, [the plaintiff's] employers adduced evidence showing that he had failed to meet their legitimate expectations, thereby rebutting any presumption that their actions were taken in retaliation for [his protected conduct].").

As for timing, it is true that Potnick's mid-November firing occurred a few weeks after he first alerted Village personnel of his desire to take FMLA leave. However, Potnick was quickly approaching the conclusion of his twelve-month probationary period—December 4, 2015—at which point it would have become much more difficult under the "just cause" standard applicable to non-probationary employees to terminate him for perceived performance deficiencies. And Potnick was fired shortly after Reynolds and Deloy concluded that Potnick had not only sent an ambulance to an incorrect location on November 3, but also attempted to enlist another municipality's battalion chief to help him conceal his error.

There is also no indication in the record that the reasons provided for Potnick's termination—either by Reynolds, who decided to fire him because of the "totality of [his] poor performance during his work as a full-time telecommunicator" and his concern that he tried to conceal his November 3 error, or by the Village's termination memo—were pretextual. Doc. 44 at ¶ 71. Potnick may believe that the Village was wrong to fire him for the November 3 incident and that he should have been informed of the Village's overall concerns earlier in his tenure. But Potnick's subjective beliefs would not allow a reasonable jury to find that the Village fired him due to his desire to take FMLA leave. *See King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir.

2017) (noting that a court assessing a retaliation claim should focus not on "whether [a defendant's] decision to fire [a plaintiff] was correct, but [on] whether it was retaliatory"); *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) ("[J]udgments regarding the fairness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on improper motive."). And Potnick has not identified any similarly situated individual—a probationary employee with an equally extensive disciplinary history, but who did not reveal an intent to take FMLA leave—who was treated more favorably than he was.

Given all this, no reasonable juror could find that Potnick's disclosure of his intent to take FMLA leave was a but-for cause of his termination. *See Lauth*, 863 F.3d at 717 ("[The plaintiff] has not cited any evidence, other than his own speculation, that might indicate that [his employer] used the litany of complaints and the documented history of his communication issues as a cover for its retaliatory motive. That speculation is insufficient to raise a question of fact, particularly in light of [the employer's] consistent, longstanding, and progressive concerns about his behavior."); *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (affirming summary judgment in a retaliation case where the adverse employment action indisputably was taken due to the plaintiff's "persistent resistance to improving her performance, which spanned the entirety of her two-year tenure"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (noting that "the reasonableness of any inference that [a plaintiff's] … complaint triggered criticism of her job performance" was undermined where the post-complaint criticism was consistent with her pre-complaint negative performance reviews). It follows that the Village is entitled to summary judgment on Potnick's FMLA retaliation claim.

**II. ADEA Claim**

Potnick's ADEA claim alleges that the Village fired him because of his age. Under the framework approved in *Ortiz*, an ADEA plaintiff survives summary judgment if he adduces evidence that, considered as a whole, would allow a reasonable juror to conclude that he was discriminated against due to his age. *See Carson v. Lake Cnty.*, 865 F.3d 526, 533 (7th Cir. 2017). *Ortiz* notes that "the burden-shifting framework created by *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),]" provides one way for a plaintiff to make the required showing. 834 F.3d at 766. The *McDonnell Douglas* framework requires that a plaintiff first make a *prima facie* case "showing that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (internal quotation marks omitted). Once this *prima facie* case is made, the burden shifts to the defendant to give a non-discriminatory reason for treating the plaintiff the way it did, and if the defendant meets *its* burden, the burden shifts back to the plaintiff to show that the defendant's explanation was a pretext. *See McDonnell Douglas*, 411 U.S. at 802, 804.

For substantially the same reasons given above as to the FMLA claim, a reasonable jury could not find that the Village fired Potnick because of his age. The only ADEA-specific wrinkle is Potnick's argument that a younger telecommunicator committed the same workplace mishaps and yet was not fired—a matter on which he must prevail in order to establish a *prima facie* case under *McDonnell Douglas*. Potnick contends in his opposition brief that Yaou, a supervisor who was younger than 35 years old, sent an ambulance to the wrong location on at least one occasion and was merely suspended, not terminated. Doc. 43 at 10. This argument does not persuade.

As an initial matter, Potnick does not maintain, let alone show, that Yaou was a probationary employee. This defeats Potnick's efforts to establish Yaou as a proper comparator because, as noted, the Village's disciplinary standards for probationary employees were more stringent that those for non-probationary employees. *See Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004) ("Purifoy and Steinhauer were not similarly situated because Steinhauer was still on probation while Purifoy was not."); *see also Brummett v. Sinclair Broadcast Grp., Inc.*, 414 F.3d 686, 694 (7th Cir. 2005) (holding that two employees were not similarly situated because one was on probation and the other was not).

Moreover, many of the facts on which Potnick's brief relies to establish Yaou's suitability as a comparator are not set forth in his Local Rule 56.1(b)(3)(B) response or Local Rule 56.1(b)(3)(C) statement. Indeed, the only assertion in Potnick's Local Rule 56.1 response and statement bearing on whether younger, similarly situated employees were treated better than he was is his assertion that he "personally witnessed other, younger, employees of the [Village] make the same errors in entering wrong addresses, and the like, for which the other younger employees were not disciplined." Doc. 48 at ¶ 30. This assertion is too vague to establish Yaou as a comparator. *See Bowen v. Bd. of Election Comm'rs*, 2017 WL 3334854, at *5 (N.D. Ill. Aug. 4, 2017) (noting that although the plaintiff's Rule 56.1 statement and response gave "*some* description of other employees' misconduct … [she] offer[ed] no basis to conclude that this misconduct is comparable [to her own]"). In any event, Potnick does not establish that Yaou or any other telecommunicator who incorrectly entered an address had a disciplinary history or performance record as unsatisfactory as his own. *See Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated."); *Amrhein v. Health Care*

*Service Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (affirming the district court's determination that the plaintiff failed to identify a similarly situated employee because each individual she named differed from her "in material respects, particularly in the disparity in their disciplinary history")

In sum, Potnick's threadbare submission that younger employees also made mistakes when entering addresses or dispatching ambulances, and yet were not terminated, is too thin a reed on which to support his ADEA claim or to distinguish it from his failed FMLA claim. It follows that the Village is entitled to summary judgment on Potnick's ADEA claim.

## Conclusion

The Village's summary judgment motion is granted. Judgment will be entered in favor of the Village and against Potnick.

February 27, 2018

_____
United States District Judge